JORGE G. TENREIRO (N.Y. Bar No. 4466991)
  tenreiroj@sec.gov
JAMES P. CONNOR (D.C. Bar No. 981864)
  connorja@sec.gov
MICHAEL J. FRIEDMAN (N.Y. Bar No. 4297461)
  friedmanmi@sec.gov
100 F Street, N.E.
Washington, D.C. 20549
Telephone: (202) 551-7977

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>TRUECOIN LLC and TRUSTTOKEN, INC.<br><br>Defendants. | Case No. C-<br><br>**COMPLAINT** |

Plaintiff Securities and Exchange Commission (the "SEC" or the "Commission") alleges:

**SUMMARY**

1. From November 2020 through at least April 2023 (the "Relevant Period"), defendants TrueCoin LLC ("TrueCoin") and TrustToken, Inc. ("TrustToken") (collectively "Defendants") illegally offered and sold securities without registering those offerings with the SEC, as required by federal law. These securities were investment contracts involving crypto assets called TrueUSD ("TUSD") and profit-making opportunities with respect to TUSD on "TrueFi," a so-called lending protocol from which Defendants stated investors could earn interest by loaning TUSD.

2. Defendants also defrauded investors by, among other things, falsely claiming that TUSD was backed "1:1" by U.S. dollars. In reality, based on a recommendation from their

investment adviser, and in order to earn a return for themselves from the proceeds of TUSD sales, Defendants had invested a substantial portion of the assets purportedly backing TUSD (the "TUSD reserves") in a speculative and risky offshore commodity fund ("Commodity Fund"), which purportedly invested in trade finance and other related financing ventures.

3. In December 2020, TrueCoin sold the TUSD operations to an unaffiliated offshore entity ("Offshore TUSD Entity"), but TrueCoin remained heavily involved in the TUSD operations until at least July 2023. During that time, the Offshore TUSD Entity and TrueCoin significantly increased the amount of TUSD reserves invested in the increasingly risky Commodity Fund, but the Defendants continued to mislead investors into thinking it was safe to invest in the investment contracts by falsely and publicly claiming that TUSD was backed one-for-one by U.S. dollars.

4. In furtherance of the fraud, Defendants included links on the TrustToken website (trusttoken.com) to the Offshore TUSD Entity's accountants' "attestation reports," which included reports that misleadingly indicated that the TUSD reserves exceeded the amount of TUSD outstanding, without disclosing the increasingly risky nature of investing the assets backing TUSD in the Commodity Fund.

5. By the fall of 2022, TrueCoin and TrustToken became aware of redemption problems at the Commodity Fund—imperiling redemptions of the TUSD reserves and calling into question whether the Commodity Fund investment was impaired—yet TrueCoin and TrustToken continued to make false statements casting TUSD as backed dollar-for-dollar while making material misstatements omitting material information regarding the redemption issues at the Commodity Fund.

6. TrueCoin and TrustToken terminated their relationship with the Offshore TUSD Entity in July 2023, but the Offshore TUSD Entity continues to offer TUSD to the public. After July 2023, when Defendants were no longer involved in the TUSD operations, there were a number of large redemptions of TUSD. By September 2024, more than 99% of the assets backing TUSD were invested in the risky Commodity Fund, such that TUSD is *not* backed "1:1" by U.S. dollars.

**VIOLATIONS**

7. By engaging in the conduct set forth in this Complaint, Defendants engaged in the unlawful offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a) and 77e(c)].

8. The Defendants' conduct also violated certain antifraud provisions of the federal securities laws: Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

9. Unless Defendants are permanently restrained and enjoined, they will continue to engage in the acts, practices, and courses of business set forth in this Complaint and in acts, practices, and courses of business of similar type and object.

**JURISDICTION, VENUE, AND INTRADISTRICT ASSIGMENT**

10. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)].

11. The Defendants, directly or indirectly, made use of the means or instrumentalities of transportation or communication in interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

12. Venue in this District is proper pursuant to Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] because the Defendants were located in and transacted business within this District, and because acts, practices and transactions constituting the violations of law alleged in this Complaint occurred within the Northern District of California.

13. Under Civil Local Rule 3-2, this civil action should be assigned to the San Francisco Division because a substantial part of the events or omissions giving rise to the claims occurred in San Mateo County, where the Defendants operated their principal place of business.

**DEFENDANTS**

14. **TrueCoin** is a Delaware limited liability company with a principal place of business in Burlingame, California. TrueCoin has not filed any registration statements with the Commission.

15.     **TrustToken** is a Delaware corporation with a principal place of business in Burlingame, California.  TrustToken has not filed any registration statements with the Commission.

## STATUTORY AND REGULATORY FRAMEWORK

16.     The Securities Act sets forth a regime of full and fair disclosure, in contrast to traditional commercial principles of caveat emptor.  Congress mandated that persons who offer and sell securities to the investing public provide sufficient, accurate information to allow investors to make informed decisions before they invest.

17.     The definition of a "security" under federal securities laws includes a wide range of investment vehicles, including "investment contract[s]." 15 U.S.C. § 77b(a)(1).  An investment contract exists when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others.  *SEC v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).  Courts have found that novel or unique investment vehicles constitute investment contracts, including interests in orange groves, animal breeding programs, railroads, mobile phones, and enterprises that exist only on the internet, including crypto assets.

18.     Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] require that an issuer of securities register the offer or sale of securities with the Commission. Registration statements provide investors with important information about the securities, including the terms of the offering, and the issuer's business operations, financial condition, results of operations, risk factors, and management.  The Securities Act prohibits persons from engaging in the unregistered offer and sale of securities in interstate commerce unless an exemption from registration applies.

19.     Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)] prohibit fraud and misrepresentations in the offer or sale of securities in interstate commerce by, among other things, obtaining money or property by means of any untrue statement of material fact or any omission of material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaging in transactions, practices, or courses of business which operate or would operate as a

fraud or deceit upon the purchaser.

# FACTS

### I. Defendants Offered and Sold TUSD Together With Profit-Making Opportunities on TrueFi in Unregistered Transactions.

20. TrueCoin—the original issuer of TUSD—and TrustToken—the developer and operator of TrueFi—were both subsidiaries of the same parent company ("Parent Company"). The Defendants shared common ownership and management, and shared employees and office space.

21. While TrueCoin and TrustToken were legally distinct entities, they disregarded corporate formalities and during the Relevant Period acted together to offer and sell investment contracts to investors by promoting TUSD and investors' potential to profit from their purchase of TUSD by lending that TUSD on TrueFi to earn interest.

22. Starting in March 2018, before the launch of TrueFi in November 2020, Defendants began offering the TUSD crypto asset for a price of one dollar. TUSD was marketed as a so-called "stablecoin," meaning that its price is meant to be pegged to $1.

23. TUSD was offered and sold on an internet website maintained by Defendants in exchange for the transfer of money to a bank or trust account held by TrueCoin. Shortly after the launch, TUSD could be traded—and was traded—on various crypto asset platforms, including some located in the United States.

24. Starting in November 2020, Defendants began operating TrueFi, a platform for lending crypto assets, where investors could make uncollateralized loans (where the borrower does not put up any security such as property or other assets in exchange for the loan) of TUSD and other crypto assets in exchange for interest paid in the loaned crypto asset. Investors could access TrueFi via the TrueFi website (truefi.io) and via an app maintained by TrustToken and available to U.S. persons.

25. In December 2020, TrueCoin sold the operations of TUSD to the unaffiliated Offshore TUSD Entity. After the sale, the Offshore TUSD Entity offered TUSD directly from its website and TrustToken continued to do so as well, as it had before the sale. As described in

a July 2023 social media post from the Parent Company announcing the final step in the transfer of the TUSD business to the Offshore TUSD Entity: "[The Parent Company] team has continued to support the TUSD business with its operations and compliance, as well as oversight of TUSD's banking and fiduciary partners, following the transfer of ownership in late 2020."

26. In addition, TrueCoin's ongoing involvement with TUSD operations included performing know-your-customer and anti-money laundering checks, maintaining a support team, providing blockchain support, "minting" (or creating) and redeeming TUSD, and maintaining audit and regulatory compliance services.

27. TrueCoin was also at least partly responsible for the design and content of the TrustToken website, which included links to buy TUSD and invest in TrueFi.

28. An officer for the Parent Company, who was also a director for TrueCoin and TrustToken ("Officer 1"), also represented the Offshore TUSD Entity as an authorized person after the sale of the TUSD business to the Offshore TUSD Entity. Officer 1's duties as an authorized person for the Offshore TUSD entity included making decisions concerning TUSD reserves and signing holdings reports on behalf of the Offshore TUSD Entity that were attached to the attestation reports—accountants' reports purporting to provide details of where and how the assets backing TUSD were held, and verification that those assets exceeded the TUSD outstanding.

29. TrueCoin further received from the Offshore TUSD Entity a portion of the interest earned on the TUSD reserves invested in the Commodity Fund through revenue sharing payments, as well as monetary incentives when the amount of TUSD issued (i.e., the amount of TUSD sold to investors) hit certain thresholds. These revenues flowed from TrueCoin to the Parent Company, and TrustToken received a portion of these funds because the Parent Company used its revenues to fund the general operations of TrustToken and TrueCoin.

30. TUSD purchasers who wanted to earn a yield on their TUSD could lend the TUSD to a TUSD pool on the TrueFi platform for the stated loan period and earn a pro rata return.

31. Throughout the Relevant Period, Defendants touted TUSD together with TrueFi

as a way for investors to make money.

32. For example, in a Medium post discussing the launch of TrueFi, the TrustToken team wrote: "At launch on November 21st, 2020, TrueFi provided for … TrueUSD lenders to earn attractive APY [annual percentage yield]" on TUSD loaned through the protocol.

33. TrustToken described TrueFi profit opportunities for TUSD in a March 2021 Medium blog post: "we are committed to further enhancing TrueFi as one of the safest protocols in the industry for obtaining capital-efficient loans, making it even more attractive to borrowers and lenders alike." The blog post further noted that TrueFi had serviced nearly $100 million of TUSD loans.

34. The TrueFi website, which TrustToken operated, advertised an estimated APY for a TUSD-denominated loan on TrueFi at 21.37%. During much of the relevant period, the TrustToken website (trusttoken.com), which the Defendants operated, also promoted the opportunity and advertised TUSD and TrueFi by stating: "Lend to earn high, stable returns on TUSD." The TrueCoin website (truecoin.com), which was available to U.S. persons, redirected potential investors to the TrustToken website.

A. **Investors Invested Money**

35. During the Relevant Period, investors tendered U.S. dollars to Defendants and the Parent Company to purchase TUSD through publicly available websites. From inception through December 2, 2020, TrueCoin minted more than 302 million TUSD in exchange for U.S. dollars. Likewise, by October 2023, more than 3 billion TUSD had been minted in exchange for U.S. dollars, which includes TUSD purchases made through the TrustToken website.

36. As noted, investors then loaned their TUSD on the TrueFi platform to earn the returns advertised by Defendants. By the end of 2021, more than 78 million TUSD, or approximately 6% of the outstanding TUSD, was purportedly loaned on the TrueFi protocol. At its peak, approximately 13.5% of TUSD was deployed in profit-making opportunities in the TUSD pool on the TrueFi platform.

B. **Investors Invested in a Common Enterprise**

37. Investors were offered an opportunity to participate in a common enterprise by

purchasing TUSD and earning interest on it, and those who purchased TUSD and elected to lend it on TrueFi did, in fact, enter in a common enterprise with other investors who so chose, and with Defendants.

38. Investors' financial fortunes were tied to the fortunes of other investors. TUSD holders who sought to earn returns pooled their TUSD in TrueFi's TUSD lending pool, and those assets where therein commingled and used indistinguishably to earn interest equally for all investors, proportional to their investments. If the investment did well, all investors obtained returns equally and in proportion to their investments. If the investments did poorly, all investors suffered losses equally.

39. Investors' fortunes were also tied to Defendants' fortunes. TrustToken itself invested directly in TrueFi's TUSD lending pool, alongside other TUSD lending pool investors, to earn a pro rata return on their TUSD in the pool. Further, the value of TrueFi's so-called governance token, a crypto asset TrustToken issued and held, was linked to the success of the TrueFi platform—as increased use of the TrueFi platform would require increased of the TrueFi governance token, thereby driving up demand for the token. Thus, if the TrueFi platform did well, Defendants further profited, at the same time as investors profited.

C. **Investors Reasonably Expected To Profit From Defendants' Efforts**

40. Investors had a reasonable expectation of profits (in the form of interest earned in the TUSD TrueFi lending pool) from TrustToken's managerial and entrepreneurial efforts to develop and operate the TrueFi platform to ensure the availability of lending opportunities to generate profits in the form of interest.

41. As set forth above, Defendants made numerous statements promoting the opportunity for TUSD purchasers to profit on the TrueFi platform, and TrustToken did in fact work to ensure the success of the TrueFi platform, including by acting as an intermediary for TrueFi contracts and vetting and onboarding institutional customers. TrustToken also operated the TrueFi website and mobile application, and frequently promoted TrueFi to the public, including U.S. investors. This included: (a) onboarding potential borrowers of TUSD and other crypto assets; (b) maintaining the software code for TrueFi; (c) overseeing TrueFi's

communication functions and governance proposals; (d) operating TrueFi social media accounts; and (e) helping institutional investors to interact with TrueFi.

42. Defendants' statements and actions, and the economic reality of the arrangements with respect to TUSD and TrueFi, have led investors to expect Defendants to undertake significant and essential technical, managerial, and entrepreneurial efforts to achieve profits for all investors.

43. Defendants have used interstate commerce to offer and sell these investment opportunities by, among other things, engaging in a general solicitation through social media and the TrustToken website widely available to U.S. investors.

44. Defendants have never had a registration statement filed or in effect with the SEC for their offers and sales of securities, and no exemption from registration applied or applies.

**II. Defendants Defrauded Investors By Falsely Claiming That TUSD Was "Fully Collateralized" and Backed "1:1" By U.S. Dollars.**

45. TrustToken and TrueCoin each made, and obtained money or property by means of, materially false and misleading statements to investors.

46. Specifically, Defendants falsely stated: (1) that TUSD was backed "1:1" with U.S. dollars, when they knew or should have known that a substantial portion of the TUSD outstanding was invested in the illiquid and risky Commodity Fund; and (2) that TUSD was fully collateralized, when they knew or should have known that a substantial portion of the TUSD reserves were at risk because of redemption issues at the Commodity Fund.

**A. Background on the Investment in the Risky Commodity Fund**

47. TrueCoin custodied the TUSD reserves—the proceeds from sales of TUSD that purportedly "backed" the token—with certain trust companies, including a Hong Kong trust ("Hong Kong Trust"), and entered into agreements with parameters for holding or investing the TUSD reserves, including that the "Hong Kong Trust" could engage an investment adviser to manage the TUSD reserves.

48. In March 2020, the Hong Kong Trust investment adviser recommended that TUSD assets be invested in the Commodity Fund, to obtain a return on the capital, and TrueCoin

49. The Commodity Fund purportedly invested in trade finance, structured trade, export finance, import finance, supply chain financing, and project financing of entities. A private placement memorandum for a share class of the Commodity Fund in which the TUSD reserve funds were invested stated: "[s]hares of the Fund are speculative and involve risks suitable only for financially sophisticated investors who are able to bear the risk of losing most or all of their investment."

50. The Commodity Fund was not a highly liquid investment because it would only aim to honor redemption requests on a quarterly basis, meaning that an investor in the Commodity Fund may have needed to wait months to redeem shares for money, such as U.S. dollars.

51. Defendants did not disclose to the public the investment of the assets backing TUSD in the Commodity Fund. Instead, as described below, Defendants falsely stated to the public that the assets backing TUSD included U.S. dollars and cash equivalents including highly liquid investments that could be readily converted to known amounts of cash.

52. After the Offshore TUSD Entity purchased the TUSD operations in December 2020, the Offshore TUSD Entity, with the knowledge and involvement of Officer 1, invested increasingly more of the TUSD reserves in the Commodity Fund. By approximately March 2022, for example, the Offshore TUSD Entity had invested $565 million of the TUSD reserves in the Commodity Fund, representing approximately 37% of the face amount of the TUSD tokens outstanding.

**B.   The Materially False and Misleading Statements and Other Fraudulent Conduct**

53. As noted, TrueCoin, TrustToken, and their agents marketed their investment opportunity as safe and trustworthy, in part by marketing that TUSD would retain a value of one dollar and, more importantly, according to Defendants and their agents (including the TrustToken website in February 2021 and on other dates), remain "fully collateralized."

54. TrueCoin retained accounting firms to provide "real-time" attestation services for

the TUSD reserves. As part of these services, the accounting firms generated "attestation reports," which included "holdings reports" purporting to show an up-to-date snapshot of the TUSD reserves and TUSD outstanding. These reports allowed the public to compare the number of TUSD sold with the amount of U.S. dollar assets backing TUSD, in order to demonstrate that TUSD was purportedly fully backed by dollars or by highly liquid investments that could readily be converted to dollars.

55. TrustToken and the Offshore TUSD Entity provided links on their websites to download the attestation reports and holdings reports.

56. Potential purchasers were falsely assured by these reports that the TUSD reserves exceeded the TUSD outstanding. It was undisclosed in the holdings reports that a significant portion of the TUSD reserves were invested in the risky Commodity Fund, which the attestation reports were valuing at cost without considering any adjustments.

57. The then-TrustToken CEO, who was also a TrueCoin director ("Officer 2"), signed holdings reports on behalf of TrueCoin that were included in certain of these attestation reports, including one on December 2, 2020, representing that the amount of "US Dollars held in Trust Account(s)" was approximately $332.5 million, whereas the amount of TUSD then issued and backed was approximately $302.1 million. In other words, the report represented that TUSD was over-collateralized and fully-backed by U.S. dollars—indicating, among other things, that TUSD holders could redeem their TUSD back to U.S. dollars readily and reliably.

58. The Commodity Fund investment at that time was not disclosed in that holdings report, but a footnote to that report stated that "[t]he USD balance includes USD cash and cash equivalents that include short-term, highly liquid investments of sufficient credit quality that are readily convertible to known amounts of cash."

59. As Defendants knew or should have known, this statement was false, because the Commodity Fund was not readily convertible to cash and was not a "cash equivalent" nor highly liquid, since, among other reasons, redemptions could take up to 90 days.

60. Reasonable investors, including before investing in Defendants' securities, would have wanted to know that TUSD reserves were not, in fact, invested in "highly liquid

investments of sufficient credit quality that are readily convertible to known amounts of cash," and would have wanted to know that TUSD reserves were actually invested in the risky Commodity Fund.

61. Defendants nevertheless made additional materially false and misleading statements in connection with their offer and sale of their securities.

62. In the March 2021 Medium blog post, for example, TrustToken falsely claimed that the TrueFi platform included a feature that enabled "decentralized finance" applications "to automatically verify on-chain that each TUSD stablecoin is backed 1:1 with US dollars held in reserve," even though at the time certain of the TUSD reserves were already invested in the risky Commodity Fund. Again, TrustToken knew or should have known that its statements about the assets backing TUSD were false. Reasonable investors would have wanted to know that TUSD was not, in fact, backed 1:1 with U.S. dollars because TUSD reserves were invested in the risky Commodity Fund.

63. Similarly, in a June 3, 2022, interview posted on YouTube, when at least $565 million of the TUSD reserves had been invested in the Commodity Fund, Officer 2 stated: "you hold one TrueUSD, it's backed by one actual U.S. dollar." Defendants knew or should have known that these statements were false, because they knew or should have known the amount of TUSD reserves invested in the Commodity Fund at that point. Reasonable investors would have wanted to know that TUSD was not, in fact, "backed by one actual U.S. dollar" because TUSD reserves were invested in the risky Commodity Fund.

64. On August 31, 2022, the Offshore TUSD Entity sought to redeem the maximum amount of the TUSD reserves invested in the Commodity Fund because the Offshore TUSD Entity had concluded that it should "exit from [Commodity Fund] exposure, which is not conducive to our liquidity and risk control requirements for TUSD." Officer 1 was copied on the redemption request.

65. By October 2022, the Commodity Fund had failed to timely honor redemption requests for the TUSD reserves invested in the fund, despite repeated requests from Officer 1 and the Offshore TUSD Entity. By March 3, 2023, Officer 1 complained to an investment adviser

with the Hong Kong Trust: "At this stage we should have received nearly another 150m as per the original discussion from last year," and "this is not a little longer than the 90 days you promised me which is so disappointing."

66. Despite the increasingly dire situation of the Defendants' investment in the Commodity Fund, which Defendants knew or should have known, later holdings reports attached to the TUSD attestation reports continued to mischaracterize the Commodity Funds investment as "short-term, highly liquid investments of sufficient credit quality that are readily convertible to known amounts of cash," when individuals at TrustToken and TrueCoin knew or should have known that (i) the Commodity Fund investment was not highly liquid, and (ii) by the fall of 2022, due to liquidity issues with the Commodity Fund and delays with redemption requests, the Commodity Fund investment was not readily convertible to known amounts of cash.

67. For example, a March 27, 2023, attestation report, which included a holdings report signed by Officer 1, stated: "[t]he USD balance … includes USD cash, cash equivalents and short-term, highly liquid investments of sufficient credit quality that are readily convertible to known amounts of cash," and investments in other instruments to generate yield. As Defendants knew or should have known, this statement was false and misleading. Indeed, Officer 1 and the Defendants were aware of the liquidity issues and problems with redemptions at the Commodity Fund, which represented approximately 24% of the TUSD reserves at that time. Reasonable investors would have wanted to know that TUSD reserves were invested in the risky Commodity Fund and its ongoing liquidity and redemption issues.

68. The TrustToken website continued to falsely claim that TUSD was "100% collateralized" and "fully collateralized" through at least May 2023. The Defendants knew or should have known that these statements were false and misleading. Reasonable investors would have wanted to know that TUSD was not, in fact, "fully collateralized" because TUSD reserves were invested in the risky Commodity Fund.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 5(a) and 5(c) of the Securities Act**
**[15 U.S. Code §§ 77e(a) and 77(e)(c)]**

69. The Commission realleges and incorporates by reference the allegations in

paragraphs 1 through 68.

70. Without a registration statement in effect, Defendants TrueCoin and TrustToken, directly and indirectly, (a) made use of the means and instruments of transportation or communications in interstate commerce or of the mails to sell securities through the use or medium of any prospectus or otherwise; (b) carried or caused to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale; and (c) made use of the means and instruments of transportation or communication in interstate commerce or of the mails to offer to sell through the use or medium of a prospectus or otherwise, securities as to which no registration statement had been filed.

71. By engaging in the conduct described above, Defendants TrueCoin and TrustToken violated, and unless restrained and enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

**SECOND CLAIM FOR RELIEF**
**Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act**
**[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]**

72. The Commission realleges and incorporates by reference the allegations in paragraphs 1 through 68.

73. Defendants TrueCoin and TrustToken, in the offer or sale of securities, by the use of means or instrumentalities of transportation or communication in interstate commerce or by use of the mails, directly or indirectly: (a) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact or by omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (b) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

74. By their conduct described above, Defendants TrueCoin and TrustToken violated, and unless restrained and enjoined will continue to violate, Securities Act Sections 17(a)(2) and

17(a)(3) [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission requests that this Court enter a Final Judgment:

**I.**

Finding that Defendants TrueCoin and TrustToken committed the violations alleged in this Complaint;

**II.**

In a form consistent with Federal Rule of Civil Procedure 65(d), permanently restraining and enjoining Defendants TrueCoin and TrustToken from, directly or indirectly, including, but not limited to, through any entity owned or controlled by the Defendants, violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)] and Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)];

**III.**

Ordering Defendant TrueCoin to disgorge, with prejudgment interest, all ill-gotten gains it derived from the activities set forth in this Complaint, pursuant to Sections 21(d)(5) and (7) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d)(5) and (7)];

**IV.**

Ordering Defendants TrueCoin and TrustToken to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)];

**V.**

Imposing a conduct-based injunction pursuant to Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d)(5) of the Exchange Act, 15 U.S.C. § 78u(d)(5), permanently enjoining Defendants TrueCoin and TrustToken from, directly or indirectly, including, but not limited to, through any entity owned or controlled by the Defendants, participating in the issuance, purchase, offer, or sale of any securities;

## VI.

Retaining jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court; and

## VII.

Granting such other relief as this Court may deem just and appropriate.

Dated: September 24, 2024              Respectfully submitted,


    /s/ Michael J. Friedman
MICHAEL J. FRIEDMAN
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION